```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/30/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
NATHANIEL ROMEO ROJAS ACEVEDO,                                   :
                                                                 :
                              Petitioner,                        :
                                                                 :     25-cv-7189 (LJL)
            -v-                                                  :
                                                                 :     OPINION AND ORDER
JUDITH ALMODOVAR, et al.,                                        :
                                                                 :
                              Respondents.                       :
                                                                 :
-----------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

For the following reasons, the petition for a writ of habeas corpus is granted.

## BACKGROUND

Petitioner Nathaniel Romeo Rojas Acevedo ("Petitioner," or "Rojas") is a national of the Dominican Republic. Dkt. No. 1 (the "Petition") ¶ 1. He has requested that the court order that Judith Almodovar, Kristi Noem, and Pamela Bondi (collectively, "Respondents") release him pursuant to a writ of habeas corpus.

Rojas originally entered the United States over two decades ago, in November of 2000, on a B-2 visa that expired in May of 2001. *Id.* On February 4, 2009, he obtained Lawful Permanent Resident ("LPR") status through marriage. *Id.* ¶ 2. On October 26, 2017, Petitioner was arrested by the New York City Police Department for credit card theft. Dkt. No. 7-1 at 5; Dkt. No. 7-7 at 2.[1] He pled guilty to the felony charges in state court and was incarcerated for forty-five days. Dkt. No. 7-1 at 5. Additionally, Petitioner was convicted of driving while intoxicated with a passenger under sixteen years old, a felony, in December of 2017. Dkt. No. 8

---

[1] Unless otherwise indicated, all page numbers to docket entries refer to ECF pagination.

("So Decl.") ¶ 5. He was further convicted of misdemeanor fraud for identity theft and misdemeanor retail theft in October of 2018 and April of 2021 respectively. So Decl. ¶¶ 7–8.

In December 2022, Petitioner departed the United States for a visit to the Dominican Republic. When he attempted to re-enter the United States a month later, the U.S. Customs and Border Protection ("CBP") officer reviewing his documentation determined that he was inadmissible pursuant to the Immigration and Nationality Act ("INA") on the basis of his criminal record. *Id.* ¶ 14. During his interview with CBP, Rojas explained that he received a green card through his ex-wife and that he owned a used car dealership. Dkt. No. 7-1 at 3–4. He confirmed that he had been convicted of the offenses detailed above and answered "yes" when asked if he understood that he "appear[ed] to be inadmissible to the United States." *Id.* at 6. He noted also that he understood he would be placed into removal proceedings, and that his admissibility would "be determined by an Immigration Judge." *Id.* The CBP official nevertheless granted Petitioner parole status, under which he could enter the United States while his immigration case was adjudicated. *Id.* ¶ 15; *see* Dkt. No. 7-1. Rojas was given a temporary I-551, in the form of a stamp in his passport, which he could use "to travel, establish employment eligibility, or to establish lawful permanent residence status." Dkt. No. 7-3.

On January 3, 2023, the same day he was paroled into the United States, Rojas was served with a Notice to Appear ("NTA"), thereby initiating removal proceedings against him. Petition ¶ 3; *see* Dkt. No. 7-2. The NTA stated that Rojas was "an arriving alien," and that he was subject to removal under 8 U.S.C. § 1182(a)(2)(A)(i)(I), which makes "inadmissible" any person who is convicted of "a crime involving moral turpitude." So Decl. ¶ 16. The NTA explained that Rojas would need to appear before an immigration judge, but it left the time and date to be determined. Dkt. No. 7-2 at 2. On April 12, 2023, the CBP served Rojas by mail with

2

a superseding NTA listing the same charges and scheduling his removal hearing for September 6, 2023.  So Decl. ¶ 17; *see* Dkt. No. 7-4 at 2.

Petitioner appeared with counsel at the hearing on September 6, 2023, where he conceded that he was removeable under the INA.  So Decl. ¶ 18.  He argued, however, that he had a right to remain in the United States because he was a returning LPR who (1) had that status for seven years, (2) had no aggravated felony conviction, and (3) was otherwise a person of good moral character.  *Id.*  On that basis, he filed an Application for Cancellation of Removal for Certain Permanent Residents on September 22, 2023.  *Id.* ¶ 19.[2]  Proceedings continued before the immigration court, and in June 2025, the Department of Homeland Security ("DHS") amended the Superseding NTA by adding a charge of inadmissibility on the basis of willful fraud or misrepresentation, *see* 8 U.S.C. § 1182(a)(6)(C)(i), and a charge of inadmissibility on the basis of seeking to procure a visa or admission by fraud, *see* 8 U.S.C. § 1227(a)(1)(A).  *Id.* ¶ 22; *see* Dkt. No. 7-5.[3]

Petitioner has been at liberty since January 2023.  However, two months ago, on August 28, 2025, as Petitioner was leaving his residence, agents from Immigration and Customs Enforcement ("ICE") arrested him and served him with a form I-200 Warrant of Arrest and an I-

---

[2] It is undisputed that Petitioner is eligible for cancellation of removal, "which would have the result of blocking the Government from stripping him of LPR status and deporting him on the basis of his theft convictions."  Dkt. No. 12 at 2.  For an LPR, cancellation of removal is available where the alien has "resided in the United States continuously for 7 years having been admitted in any status, and has not been convicted of any aggravated felony."  8 U.S.C. § 1229b(a).  Although Rojas is eligible for cancellation of removal, that relief is discretionary— immigration judges have "broad discretion" in weighing the evidence before them in deciding whether or not to award that relief.  *See Garcia v. Wilkinson*, 847 F. App'x 50, 54 (2d Cir. 2021) (summary order) (citing *In re C-V-T-*, 22 I. & N. Dec. 7, 11 (B.I.A. 1998)).
[3] The first charge is based on the fact that in 1998, Rojas was convicted in New York criminal court of a forced conversion charge that he had allegedly not previously disclosed.  Dkt. No. 7-5 at 3.  DHS later withdrew the second charge under Section 1227(a)(1)(A).  So Decl. ¶ 23.

3

286 Notice of Custody Determination. *Id.* ¶ 25; Dkt. No. 7-6 (form I-213).[4] The Government has provided neither to the Court. It is undisputed that Petitioner has received no notice that his parole status has been terminated, and that ICE did not give Petitioner any information as to the reason for his detention. Petition ¶ 21. He was briefly detained at 26 Federal Plaza in New York City. *Id.* ¶ 11. That same day, ICE transferred Petitioner to a jail in Goshen, New York. So Decl. ¶ 27. Since his detention, the Immigration Judge has scheduled an individual hearing for October 31, 2025 to address the merits of his applications for relief. *Id.* ¶ 34.

The day of his detention, Petitioner sought a writ of habeas corpus in this Court. He argues that his detention violates both his procedural and substantive due process rights. *Id.* ¶¶ 26, 36.

## PROCEDURAL HISTORY

On August 28, 2025, the day that Petitioner was detained by ICE agents, he filed the instant Petition seeking a writ of habeas corpus directing Respondents to release him from custody. Petition at 9. On September 2, 2025, the Court ordered that the Respondents show cause why the Petition should not be granted, and it further ordered that Petitioner not be removed from the district pending adjudication of the Petition absent an order of this Court. Dkt. No. 3. The Government submitted its response in opposition to the Petition on October 7, 2025, which included seven attached exhibits. Dkt. No. 7. On the same day, the Government separately filed the declaration of ICE Officer Mincheol N. So and a memorandum of law. Dkt. Nos. 8–9. On October 13, 2025, Petitioner requested an extension of time to file a response to

---

[4] In his petition, Rojas states that he was apprehended by ICE agents after attending a scheduled immigration hearing. Petition ¶ 4. In his brief in reply to the Government's opposition, he clarifies that he was detained outside of his home. Dkt. No. 12 at 2.

the Government's brief, which the Court granted the next day. Dkt. Nos. 10–11. Petitioner filed his reply in response to Respondents' opposition on October 20, 2025. Dkt. No. 12.

## LEGAL STANDARD

Rojas brings a petition for a writ of habeas corpus under 28 U.S.C. § 2241, which "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or law or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)). "Federal courts have jurisdiction to hear habeas corpus claims by noncitizens challenging the constitutionality of their detention." *Lopez v. Sessions*, 2018 WL 2932726, at *6 (S.D.N.Y. June 12, 2018) (citing *Denmore v. Kim*, 538 U.S. 510, 516–17 (2003)).

## DISCUSSION

**I.    Procedural Due Process**

Plaintiff argues that the Respondents have violated his procedural due process rights under the Fifth Amendment of the Constitution.

The Government argues that the Petition should be denied because Petitioner is technically an "applicant for admission" to the United States whose detention is mandatory under Section 1225(b)(2) of the INA. While Petitioner is an LPR and has been at liberty in the United States, under the INA, an individual is regarded as "seeking admission into the United States" despite his LPR status if he has "committed an offense identified in section 1182(a)(2) of this title." 8 U.S.C. § 1101(a)(13)(C)(v). The referenced offenses encompass "crime[s] involving moral turpitude," which Petitioner does not contest includes his prior convictions for grand larceny and identity theft. *Id.* § 1182(a)(2)(A)(i)(I); *see Mendez v. Mukasey*, 547 F.3d 345, 347 (2d Cir. 2008) ("[T]he courts of appeals have interpreted 'moral turpitude' as including a wide variety of crimes that involve some fraud or deceit.") (quoting *Omagah v. Ashcroft*, 288 F.3d

5

254, 260 (5th Cir. 2002)). "As an arriving alien determined to be inadmissible based on prior criminal conviction, [Petitioner] is regarded as 'seeking admission,' *see* 8 U.S.C. § 1101(a)(13)(C)(v), and is therefore subject to § 1225(b)." *Perez v. Aviles*, 188 F. Supp. 3d 328, 332 (S.D.N.Y. 2016). Petitioner concedes that his case is governed by Section 1225.

As a noncitizen applicant for admission entering the United States in January of 2023, Petitioner was subject to inspection by an immigration officer and to mandatory detention unless the immigration officer determined that he was "clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A). Petitioner was not admitted. Because the INA provides that an applicant for admission to the United States who is not admitted "shall be detained" while removal proceedings are initiated under 8 U.S.C. § 1229a, *id.*, the Government argues that Petitioner is entitled to only the process granted by Congress in the INA, which—in this case— amounts to no process at all.

For his part, Petitioner emphasizes the fact that although he was not formally admitted to the United States, he was nevertheless permitted to enter. The immigration officer had the power to detain Petitioner, but he chose not to do so under the doctrine of immigration parole. *See* 8 U.S.C. § 1182(d)(5)(A). Under that doctrine, even a noncitizen applicant for admission who falls into the category of those that "shall" be detained may be permitted to cross into the United States and live here pending further immigration proceedings. A paroled noncitizen is neither formally admitted to nor excluded from the United States, and parole status is valid until revoked. *Id.* Respondents do not contest that Petitioner remained on parole at the time of his arrest and detention and to date maintains that status. In practice, Petitioner was at liberty beginning in January 2023, subject only to the risk of a final adjudication of removal or formal

6

revocation of parole—that is, until ICE arrested him outside his home without notice and without having revoked his parole.

Petitioner's case falls between two separate lines of authority from the Supreme Court.

On the one hand, noncitizens who are formally admitted to the United States are protected by the Due Process Clause of the Fifth Amendment.  "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  Put simply, "all persons within the territory of the United States are entitled to the protection guaranteed by [the Fifth Amendment]," and "even aliens shall not be . . . deprived of life, liberty, or property without due process of law." *Wong Wing v. United States*, 163 U.S. 228, 238 (1896). The nature of the exact protections afforded those persons within the country "may vary depending upon the status and circumstance." *Zadvydas*, 533 U.S. at 694.

On the other hand, the law is clear also that a noncitizen who seeks admission to the United States but is denied entry is not entitled to the same constitutional protections afforded persons who are physically present in the country.  For those at the "threshold" who are ultimately "denied entry," "[w]hatever the procedure authorized by Congress is, it is due process." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1952) (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950)); *see Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020) ("While aliens who have established connections in this country have due process rights in deportation proceedings, the Court long ago held that Congress is entitled to set the conditions for an alien's lawful entry into this country and that, as a result, an alien at the threshold of initial entry cannot claim any greater rights under the Due Process Clause.").

In *Mezei*, the petitioner was a noncitizen who left the United States "without authorization or reentry papers" to reside behind the Iron Curtain for nineteen months and who was, upon his return, temporarily excluded from the United States by an immigration inspector. 345 U.S. at 208, 214.  He was received at Ellis Island and stranded there "because other countries [would] not take him back." *Id.* at 207.  It was undisputed that the Government could keep Mezei and other "entrants at sea aboard the vessel pending determination of their admissibility." *Id.*  That being the case, the fact that due to "resulting hardships to the alien and inconvenience to the carrier" Congress decided to "adopt a more generous course" and allow "temporary removal from ship to shore" "bestows no additional rights." *Id.*  In that "temporary harborage," he was "treated as if stopped at the border." *Id.*  Therefore, Mezei was entitled to only the statutory protections granted by Congress.  *Id.* at 212.  In *Thuraissigiam*, the petitioner crossed the border without inspection or an entry document and was arrested by Border Patrol that night "within 25 yards of the border."  591 U.S. at 114.  The Court concluded, citing *Mezei*, that "an alien in respondent's position has only those rights regarding admission that Congress has provided by statute." *Id.* at 140.  The Court rejected the argument that the petitioner earned due process rights because "he succeeded in making it 25 yards into U.S. territory before he was caught." *Id.* at 139.  "Like an alien detained after arriving at a port of entry, an alien like respondent is 'on the threshold.'" *Id.* at 140 (quoting *Mezei*, 345 U.S. at 212).

Petitioner's case does not fall neatly into the rule articulated in either *Zadvydas* or *Mezei*.  Unlike the petitioner in *Zadyvdas*, as a parolee Petitioner "shall not be considered to have been admitted" to the United States.  8 U.S.C. § 1101(a)(13)(B).  Unlike the petitioners in *Mezei* and *Thuraissigiam*, he was not "on the threshold," except in only the most metaphysical way.  He is a lawful permanent resident paroled into the United States who was at liberty and living an

8

unrestricted life before his arrest; his condition can hardly be compared to that of Mezei, who remained in detention from his arrival, or to Thuraissigiam, who entered the country without detection for only the briefest moment.

In determining whether Rojas is entitled to constitutional due process protections, the Court draws guidance from a series of cases decided in comparable circumstances. In each, the petitioner was a noncitizen who was subject to mandatory detention but who was living at liberty in the United States before being arrested without notice and without a hearing. And in each, the court held that the process provided by Congress (which was none) did not define the limits of due process that the noncitizen living in the United States was entitled to under the United States Constitution.

In *Al-Thuraya v. Warden*, the petitioner was a noncitizen who surrendered to authorities at the border and was placed into removal proceedings and detained pursuant to 8 U.S.C. § 1225(b)(1). *See* 2025 WL 2858422, at *1 (S.D.N.Y. Oct. 9, 2025). That statute, much like Section 1225(b)(2), provides for mandatory detention. *See* 8 U.S.C. § 1225(b)(1)(B)(iv) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed"). While removal proceedings were ongoing and without being "admitted" to the United States, the petitioner was paroled from detention. He was later re-detained, and his asylum claim denied. He subsequently appealed that denial. *Id.* The court held that a noncitizen like Al-Thuraya who "has neither been admitted . . . or excluded" is entitled to the protections of the Due Process Clause. 2025 WL 2858422, at *4. The court distinguished *Mezei*, holding that "the concern animating the entry fiction exception—that is, the political branches' authority to legally admit or exclude noncitizens—doesn't apply here" because the Government "lacks the

9

authority to remove Al-Thuraya" until his appeal is "hashed out." *Id.*  In *Zhu v. Genalo*, the petitioner was subject to an order of removal pursuant to which detention was mandatory during a ninety-day period.  2025 WL 2452352, at *4 (S.D.N.Y. Aug. 26 2025) (referencing 8 U.S.C. § 1231(a)(1)(a)).  He had nevertheless been released from ICE custody on an "Order of Supervision" because China would not accept his repatriation.  *Id.* at *1.  Petitioner lived freely in the United States between mid-2018 and August of 2025 on that basis.  *Id.*  Upon his arrest without notice in 2025, the court held that "Petitioner's liberty interests are implicated by his redetention even if ICE has discretion to revoke his supervision" because the revocation was done "without appropriate process." *Id.* at *5.  The Northern District of California in *Guillermo M.R. v. Kaiser* addressed the habeas corpus petition of a non-admitted noncitizen who was detained, released on bond, and later re-detained without notice.  2025 WL 1983677, at *1–3 (N.D. Cal. July 17, 2025).  The court found that due process protections applied, and that because the petitioner had been present in the United States "since he was a child," his "liberty interest is even greater than Zadvydas's." *Id.* at *6.  And in *Pinchi v. Noem*, the Northern District of California adjudicated the habeas petition of a noncitizen paroled into the United States and held that "even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody." *Pinchi v. Noem*, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025).

    The four cited cases vary in their facts and reasoning, but at base, all hold that a non-admitted noncitizen is not precluded from seeking the protections of the Due Process Clause where they are granted limited status in the country by the Government and that status was revoked without notice.  Put differently, a noncitizen who is neither admitted nor denied, but

who is granted permission to live in the United States, is protected by the Due Process Clause. *See also Lopez Benitez v. Francis*, 2025 WL 2371588, at *9 (S.D.N.Y. Aug. 13, 2025); *Valdez v. Joyce*, 2025 WL 1707737, at *2 (S.D.N.Y. June 18, 2025); *Kelly v. Aldmodovar*, 2025 WL 2381591, at *3 (S.D.N.Y. Aug. 15, 2025).[5]

The reasoning in these cases follows naturally from the Supreme Court's jurisprudence that a liberty interest, once granted, cannot be revoked without due process. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. "Case after case instructs us that in this country liberty is the norm and detention 'is the carefully limited exception.'" *Velasco Lopez v. Decker*, 978 F.3d 842, 851(2d Cir. 2020) (citing *United States v. Salerno*, 481 U.S. 739, 755 (1987)). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).

In *Morrissey v. Brewer,* the Supreme Court held that an inmate who had been released from prison on parole, but re-incarcerated after his parole was revoked without any notice or hearing, was entitled to due process under the Constitution. 408 U.S. 471, 472–73 (1972). The Court "rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.'" 408 U.S. at 481 (quoting *Graham v. Richardson*,

---

[5] The Government cites two district court cases where the courts determined that the habeas petitioner was not entitled to the protections of the Due Process Clause. In both, the noncitizens had been affirmatively denied entry to the United States, and the courts therefore determined that *Mezei* controlled. *See Poonjani v. Shanahan*, 319 F. Supp. 3d 644, 645 (S.D.N.Y. 2018) (petitioner was ordered removed *in absentia*); *Mendez Ramirez v. Decker*, 612 F. Supp. 3d 200, 207–08 (S.D.N.Y. 2020) (same); *see also Guzman v. Tippy*, 130 F.3d 64, 65 (2d Cir. 1997) (no due process rights where temporary status was revoked). Whether a noncitizen who has lived in the United States while subject to an order of exclusion might possess due process rights is not before this Court.

11

403 U.S. 365, 374 (1971)). "Whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer grievous loss.'" *Id.* (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring)). Because "the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others," "[i]ts termination calls for some orderly process, however informal." *Id.* at 482. On parole, Morrissey was "gainfully employed and [was] free to be with friends and family and to form the other enduring attachments of normal life." *Id.* As to what "process is due," the Court held that parole could not be revoked "unless there is first an appropriate determination that the individual has in fact breached the conditions of parole," and that an "informal hearing structured to assure the finding of parole violation will be based on verified facts and the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior." *Id.* at 484.

Applying the reasoning of *Morrissey*, the Supreme Court in *Gagnon v. Scarpelli*, 411 U.S. 778 (1973) held that an individual whose probation was revoked was similarly entitled to due process protections. "Probation revocation, like parole revocation, is not a stage of criminal prosecution, but does result in loss of liberty. Accordingly, we hold that a probationer, like a parolee, is entitled to a preliminary and final revocation hearing, under the conditions specified in *Morrissey v. Brewer*." *Id.* at 782. Decades later, in *Young v. Harper*, 520 U.S. 143, 147 (1997), the Court determined that an inmate incarcerated for murder who was released on pre-parole "to reduce prison overcrowding" was entitled to those same due process protections. *Id.* at 149. The pre-parolee in *Young* had, like the parolee in *Morrissey*, "kept his own residence," "sought, obtained, and maintained a job," and "lived a life generally free from the incidents of

12

imprisonment." *Id.* at 148; *see also Kim v. Hurston*, 182 F.3d 113, 118–19 (2d Cir. 1999) (applying *Young* to an inmate's removal from a work release program).

Rojas's petition and immigration status are legally indistinguishable from the petitioners in the cited district court cases. Those cases, moreover, are consistent with the Supreme Court's decisions in *Morrissey* and its progeny. This Court therefore joins those decisions in concluding that a noncitizen who has been neither admitted nor denied entry to the United States, but who is present in the country through some permission of the Government, is entitled to due process rights.

Prior to being detained without notice, Petitioner enjoyed all the privileges of a free man with the permission of the Government, and thus acquired a liberty interest under the Due Process Clause. He was able to do a "wide range of things" available to persons who reside in this country. *See Morrissey*, 408 U.S. at 482. He was able to "be gainfully employed and . . . [was] free to be with family and friends and to form the other enduring attachments of normal life." *Id.* During his two-and-a-half-plus years living in the country on parole, Petitioner "kept his own residence," "sought, obtained, and maintained a job," and "lived a life generally free of the incidents of imprisonment." *See Young*, 520 U.S. at 148. That liberty "was not unlimited," *id.*, as Rojas was required to (and did) continue to attend removal proceedings in immigration court; but that does not mean that no due process rights apply. *See Morrissey*, 408 U.S. at 482. As with the individuals in *Morrisey*, *Gagnon*, and *Young*, his life in the United States on immigration parole "include[d] many of the core values of unqualified liberty"; thus, "[i]ts termination calls for some orderly process." *Id.* Indeed, "[g]iven the civil context, his liberty interest is arguably greater than the interest of parolees in *Morrissey*." *Guillermo M.R.*, 2025 WL 1983677, at *4 (quoting *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019)).

13

The Government's "promise" to Rojas of his continuing liberty is express too in the statutory and regulatory authority under which he was granted parole. By the powers granted to the Secretary of Department of Homeland Security in 8 U.S.C. § 1182(d)(5)(A):

> The Secretary of Homeland Security may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

Upon the grant of parole, Petitioner could use his status "to travel, establish employment eligibility, or to establish lawful permanent resident status." Dkt. No. 7-3. Petitioner was never stripped of his parole status; the implementing regulations for 8 U.S.C. § 1182 clarify that for the Government to formally revoke parole status, a "written notice to the alien" is required. 8 C.F.R. § 212.5(e)(2)(i); *see Orellana v. Francis*, 2025 WL 2402780, at *2 (S.D.N.Y. Aug. 19, 2025) (noting that DHS issued a "Notice of Termination of Parole," which advised the noncitizen that DHS was "exercising its discretion and terminating [their] parole in seven days"). "[R]evocation of parole" under DHS' own rules "'requires a case-by-case assessment to comply with the statute,' and 'must attend to the reasons an individual noncitizen received parole' initially." *Savane v. Francis*, 2025 WL 2774452, at *8 (S.D.N.Y. Sept. 28, 2025) (quoting *Mata Velasquez v. Kurzdorfer*, 2025 WL 1953796, at *11 (W.D.N.Y. July 16, 2025)).[6]

Petitioner thus is protected by the Due Process Clause and was therefore entitled to at least a notice of revocation of parole, issued pursuant to the statute and regulations, including an

---

[6] The Government does not mention or argue that Petitioner's parole was terminated either "automatically . . . at the time of expiration of the time for which parole was granted," or by the service of a "Charging document." 8 C.F.R. § 212.5(e)(2)(i)–(ii).

14

individualized reason for its termination. *See Morrissey*, 408 U.S. at 484. The "essence of due process is the requirement that 'a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it." *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (quoting *Joint Anti-Fascist Comm.*, 341 U.S. at 171–72). To hold otherwise would be to permit the Government to act arbitrarily and without consequence. Absent any due process protections, the Government could at any time and without any notice arrest a noncitizen and detain them for months on end (perhaps even indefinitely, as the Government has argued elsewhere) despite previously permitting them to live and work here. The consequences of such a holding would reverberate for the millions of individuals in this country on parole as they await final decisions on their right to asylum or other status.

## II.     Relief

Having determined that Rojas was owed due process but provided none, his petition for a writ of habeas corpus shall be granted. The question remains as to the appropriate relief.

Rojas seeks the "typical remedy" for "unlawful executive detention," which "is, of course, release." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). "[T]he traditional function of the writ is to secure release from illegal custody"; it is the "usual remedy by which a man is restored again to his liberty, if he have been against law deprived of it." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) (internal citation omitted). Habeas corpus "is perhaps the most important writ . . . affording as it does a swift and imperative remedy in all cases of illegal restraint or confinement." *Fay v. Noia*, 372 U.S. 391, 400 (1963) (internal citation omitted). And "if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release." *Id.* at 402. The Court has determined that the Government violated Petitioner's procedural due process rights under the Constitution, and he is

therefore entitled to release. The Government does not dispute that if the Due Process Clause applies, release is the appropriate remedy.

In his briefing, Petitioner points the Court to the Second Circuit's opinion in *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024), *reh'g en banc denied*, 2025 WL 2989687 (2d Cir. Oct. 24, 2025), in which the Circuit held that noncitizens' constitutional due process rights preclude an unreasonably long detention under a separate provision of the INA, Section 1226(c). *Id.* at 138. In reaching that conclusion, the court applied the test laid out by the Supreme Court in *Mathews* to determine "when and what additional procedural protections are due such a detainee." *Id.* The *Mathews* test requires a court to consider (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. However, the reasoning of *Black* in applying that framework is inapposite considering the procedural posture of Rojas's habeas petition. In *Black*, both petitioners "agree[d]" that the government could detain them without an initial bond determination under Section 1226(c), and argued only that "their prolonged detentions without a bond hearing violated their due process rights." *Id.* at 142. On that basis, the Second Circuit then held that "due process challenges to prolonged detention under section 1226(c) should . . . be reviewed under *Mathews*." *Id.* at 147. Rojas, on the other hand, has not sought a writ of habeas corpus on the basis that he has been detained too long; he submitted his petition the very day he was arrested. He argues instead that his detention was invalid at its inception because he was a parolee into the United States who received no notice before his arrest by ICE. There is no need

16

to engage in the *Mathews* analysis of what process might be due, because Rojas seeks only "simple release." *Munaf*, 553 U.S. at 693.

Petitioner does not argue that there are no conditions under which ICE could lawfully detain him, and the Government proffers no argument that Rojas was afforded any process in connection with his present detention. This Court therefore need not consider now the full extent of what due process might require. It does not need to determine, for example, when and under what circumstances a noncitizen whose parole is revoked and who is subsequently arrested might be entitled to a bond hearing. The Court's conclusion is simple: Rojas was paroled into the United States. He lived here freely for years. His parole status was never revoked. He is therefore entitled to notice of such revocation before it occurs, and an individualized explanation as to why. As the Government concedes, that did not happen. He is therefore entitled to release.

### III.   Substantive Due Process

Having determined that Petitioner's procedural due process rights were violated, and that he is entitled to a writ of habeas corpus on that basis, the Court does not address his alternative arguments that his substantive due process rights were violated.

### CONCLUSION

The petition for a writ of habeas corpus is GRANTED. Respondents are ORDERED to immediately release Rojas from custody and to certify compliance with the Court's order by filing an entry on the docket no later than October 30, 2025.

SO ORDERED.

Dated: October 30, 2025
       New York, New York

_____
                   LEWIS J. LIMAN
                   United States District Judge